NO. 12-04-00283-CV
 
IN THE COURT OF APPEALS

TWELFTH COURT OF APPEALS DISTRICT

TYLER, TEXAS
§APPEAL FROM THE 
IN THE INTEREST OF
§COUNTY COURT AT LAW
J.P.M., A CHILD
§ANDERSON COUNTY, TEXAS
                                                                                                                                                            
MEMORANDUM OPINION
            Appellant Misty Laine McLelland (formerly Mobley) appeals the trial court’s order
modifying the parent-child relationship. In her sole issue, Misty contends that the trial court abused
its discretion by granting Daniel Paul Mobley’s petition to modify because he presented no evidence
or insufficient evidence that a material change of circumstances had occurred or that the modification
was in the best interest of the child. In three issues, Appellant-Intervenor James Stacey Mason
appeals the trial court’s order dismissing his petition in intervention. We affirm.
 
Background
            Misty is the mother of J.P.M., born March 10, 1998. At the time, Misty and Daniel had a
sexual relationship, and Daniel was named as the father on J.P.M.’s birth certificate. On
December 4, 1998, Misty and Daniel were married, but, on February 1, 2000, Misty filed for divorce. 
In the divorce decree dated January 23, 2001, the trial court found that Misty and Daniel were the
parents of J.P.M. Misty and Daniel were appointed joint managing conservators of J.P.M. with
Daniel having the right to establish the child’s primary residence. Misty was granted possession of
J.P.M. each week from 8:00 a.m. Thursday until 12:00 p.m. Sunday. Daniel was granted possession
of J.P.M. each week from 12:00 p.m. Sunday until 8:00 a.m. Thursday. Misty and Daniel evenly
divided holidays. Neither parent was ordered to pay child support, although Daniel was ordered to
provide health insurance for J.P.M. 
            On October 17, 2003, Daniel filed an amended petition to modify the parent-child
relationship, alleging that the January 23, 2001 order was not workable and that the circumstances
of the child, a conservator, or other party affected by the order had materially and substantially
changed since the order. Daniel requested that Misty be granted standard visitation and be ordered
to pay child support. Misty answered and filed a counter petition to modify, specifically requesting
that she be appointed the person with the right to designate the child’s primary residence and that
Daniel be ordered to pay child support. Further, Misty filed a motion for enforcement, alleging that
Daniel had not maintained a policy of health insurance for J.P.M. 
            A hearing on Misty’s and Daniel’s respective petitions and motions was held on April 6,
2004. On May 25, the trial court found that the material allegations in the petition to modify were
true and that the requested modification was in the best interest of the child. The trial court appointed
Misty and Daniel joint managing conservators with Daniel having the exclusive right to designate
the primary residence of the child within seventy-five miles of Palestine as long as Misty resided
within seventy-five miles of Palestine. Misty was granted standard visitation of J.P.M. The trial
court denied Misty’s motion for enforcement.
            On the same date as the modification order, Misty filed a motion for genetic testing. Further,
on June 14, James filed a petition in intervention for conservatorship, alleging that DNA testing
revealed he was J.P.M.’s biological father. James requested that the court order additional genetic
testing to confirm the DNA test results and a new birth certificate changing J.P.M.’s last name to
reflect that Daniel was not J.P.M.’s father. Moreover, James requested that the trial court appoint
him and Misty as joint managing conservators of J.P.M. Daniel filed a motion to dismiss, alleging
that James had no standing to intervene, that estoppel prevented James from asserting his parentage,
that it would be inequitable to disprove his relationship with J.P.M., and that the issue of paternity
was barred by res judicata. On August 5, the trial court conducted a hearing on James’s intervention
and Daniel’s motion to dismiss. The trial court found that Daniel was the presumed father of J.P.M.
and that the prescriptive period in section 160.607 of the Texas Family Code had expired. Although
the trial court found that Daniel was the adjudicated father of J.P.M., it also found that J.P.M.’s
paternity was first established under the statute for a presumed father and, thus, section 160.607
controlled. The trial court granted Daniel’s motion to dismiss James’s petition in intervention. 
            In its findings of fact and conclusions of law, the trial court found, in part, that Misty alleged
in her divorce petition that Daniel was the father of J.P.M. and that Daniel sought relief in his
counter petition for divorce premised on his paternity of J.P.M. The trial court found that, in her
counter petition to modify, Misty alleged that Daniel was J.P.M.’s father. The trial court noted that
when Misty orally asserted that Daniel was not J.P.M.’s father in open court on May 25, 2004, “[t]his
[was] the first time that [Misty] has in any way questioned paternity in these court proceedings or
anywhere else since before the birth of the child.” The trial court found that, from J.P.M.’s birth to
the present, Daniel voluntarily and continuously asserted his paternity of J.P.M., that a loving,
supportive, and nurturing parent-child relationship existed between Daniel and J.P.M., and that
J.P.M. had known only one person, Daniel, as his father. In its conclusions of law, the trial court
stated that Daniel was the presumed father of J.P.M., that the prescriptive period in section
160.607(a) of the Texas Family Code was applicable, that the petition in intervention was barred by
limitations, and that the motion to dismiss should be granted. This appeal followed.
 
Modification
            In her sole issue, Misty contends that the trial court abused its discretion by granting Daniel’s
petition to modify because he presented no evidence or insufficient evidence that a material change
of circumstances had occurred or that the modification was in the best interest of the child. Daniel
argues that the trial court’s decision was supported by significant and ample evidence. 
Applicable Law
            A trial court’s modification of conservatorship is reviewed for abuse of discretion. In re
P.M.B., 2 S.W.3d 618, 621 (Tex. App.–Houston [14th Dist.] 1999, no pet.). It is an abuse of
discretion for a trial court to rule without supporting evidence. Id. The best interest of the child is
the primary consideration in determining conservatorship or residency of a minor child. Villasenor
v. Villasenor, 911 S.W.2d 411, 419 (Tex. App.–San Antonio 1995, no writ).
            According to section 156.101 of the Texas Family Code, the trial court may modify an order
or portion of a decree that provides for the appointment of a conservator of a child, that provides the
terms and conditions of conservatorship, or that provides for the possession of or access to a child
if (1) modification would be in the best interest of the child and (2) the circumstances of the child,
a conservator, or other party affected by the order have materially and substantially changed since
the date of the rendition of the order. Tex. Fam. Code Ann. § 156.101 (Vernon 2002). Whether
there has been a material and substantial change of circumstances affecting the child is normally to
be determined by an examination of the evidence of changed circumstances occurring between the
date of the order or judgment sought to be modified and the date of the filing of the motion to
modify. Gibbs v. Greenwood, 651 S.W.2d 377, 379 (Tex. App.–Austin 1983, no writ).
The Evidence
            Daniel had worked in the Bacon Autoplex service department for two and one-half years and 
earned approximately $1,000 every two weeks. At the time of trial, Daniel, his wife, Dora, J.P.M.,
and Dora’s son by a previous relationship lived in a two bedroom mobile home on three and one-half
acres next to Daniel’s mother, Teresa Mobley, and brother. In September 2003, Daniel discovered
that Misty was moving seventy miles away or forty-eight miles plus the distance to the Slocum
School. He also learned that Misty was going to be living with a man, but was not married. Daniel
believed that he should be the primary caretaker of J.P.M. because he wanted to ensure that J.P.M.
was in a stable home.
            From the date of the divorce until Daniel filed suit in this matter, the longest period of time
that J.P.M. had been out of his or Teresa’s house was two nights. After the divorce, he and J.P.M.
lived with Teresa about eight to nine months. During that time, Misty picked up J.P.M. at Teresa’s
house on Saturday morning about twice a month and returned him either Saturday night or Sunday
morning. After Daniel married Dora on November 9, 2001, Daniel, Dora, Dora’s son, and J.P.M.
moved to Palestine. When J.P.M. began pre-kindergarten at the Slocum School, Daniel and his
family moved to their present home, and Misty maintained the same possession schedule. After
school, J.P.M. rides the bus to Teresa’s house with Daniel’s brother’s three children. Usually, Daniel
or Dora picks up J.P.M. between 5:00 p.m. and 5:30 p.m. According to Daniel, in 2002 when J.P.M.
was in pre-kindergarten, Misty went approximately two months without visiting the child. 
            In the summer of 2003, Daniel enrolled J.P.M. in the YMCA. Misty refused to pay a portion
of the enrollment fee although she had court ordered possession of J.P.M. on Thursdays and Fridays.
She also changed her possession schedule. According to Daniel, Misty began picking up J.P.M. on
Thursday afternoon at the YMCA and returning him on Friday afternoon or Saturday morning. 
When school began, Misty returned to her usual possession schedule, which was one and one-half
days instead of three and one-half days as ordered by the court. After Daniel filed for modification,
Misty began exercising the maximum possession ordered by the court, even taking J.P.M. for spring
break for the first time since the divorce. At that time, Daniel noticed J.P.M. changed, his behavior
worsened, he became more rebellious, and he did not sleep on Wednesday nights. Once, Daniel
received a note from the school regarding a behavior problem with J.P.M. He admitted that J.P.M.
had more problems in school this year even though he was doing well academically. Daniel believed
it was good that Misty took J.P.M. to counseling and stated that he was willing to pay for part of the
costs.
            Daniel admitted that he was a body builder, but denied ever using steroids. He admitted that
when he and Misty were separated, she filed a protective order against him, but stated that it was
denied. He testified that he was arrested for a moving violation for not paying a ticket and admitted
that he was charged with assault causing bodily injury. However, Misty filed an affidavit of
nonprosecution on the assault charge. Daniel admitted that he and Dora separated in September or
October 2003 for a few days. Daniel explained that he did not have a telephone because Misty
continued to call and argue with him, attempting to interfere with his life. 
            Misty testified that she lived in Tyler with her new husband, Ty. She and Ty began living
together in October 2003. She agreed that it was not good for J.P.M. to be in the house with her and
a man who was not her husband. She and Ty married on December 19, 2003. Misty had another
child, an older son, by a previous relationship. According to Misty, her older son had lived with his
father since he was about six years old and was currently living with his father until summer. In
September 2002, she began school to become a licensed vocational nurse and completed her training
in August 2003. Because she was unable to find employment in Palestine, she began working for
Mother Frances Hospital in Tyler in September 2003. Misty earned $2,400 per month. At the time
of trial, she worked nights in the medical-surgical unit, 7:00 p.m. to 7:00 a.m., three days one week
and four days the next week. However, Misty obtained her schedule a month in advance and would
be able to make proper arrangements for babysitters if needed. During the school year, she would
be awake when J.P.M. came home from school. Misty admitted that J.P.M. would be spending a lot
of time with her husband, but stated that J.P.M. loved Ty. Misty stated that, when she is not
available to care for J.P.M., Ty, Ty’s parents, or a babysitter can care for him. Misty also testified
that, in September 2004, she would be working for Doctor’s Clinic, Monday through Friday, from
7:00 a.m. to 3:00 p.m. 
            Misty stated that J.P.M. was about three months old when he went to live with Daniel and
Teresa and that she accompanied him. Misty testified that, after the divorce, she saw J.P.M. every
Thursday through Sunday and never missed a week of her court ordered possession. Misty admitted
that when it was her time of possession and she was in school, Teresa would look after J.P.M. Misty
stated that, on her day of possession, she travels to Teresa’s house to pick up J.P.M. when she gets
out of school or off work. If she arrives after Daniel gets off work, Daniel picks up J.P.M. Then,
Misty is unable to contact Daniel to pick up J.P.M. because Daniel has no telephone. Misty admitted
that, on a few occasions, she may not have picked up J.P.M. on Thursday and may have returned him
early on Saturday night. In the summer of 2003, Misty never took J.P.M. to the YMCA on Fridays. 
She testified that she was not allowed possession of J.P.M. on holidays or spring break because
Daniel refused to deviate from his weekly time of possession. 
            According to Misty, Daniel did not cooperate with her. While in nursing school, she
attempted to switch days with him to study, but Daniel refused. Misty discovered that, on the school
emergency contact, Dora was listed as J.P.M.’s mother until the week before trial. She believed that
Daniel was poisoning J.P.M.’s mind against her, i.e., telling him he did not have to mind her. Misty
took J.P.M. to see a counselor because he began to have problems at school, to kick and hit her, and
to tell her she was stupid, that he did not have to mind her, and that she was not his real mother.
When she attempted to talk to Daniel about J.P.M.’s problems, he walked away. Misty was very
concerned about J.P.M.’s education and wanted him to go to college. If she obtained custody, she
planned for J.P.M. to attend Chapel Hill schools. If Daniel were granted custody, she did not believe
he would help her maintain a close relationship with J.P.M. 
            Misty testified that Daniel had been violent toward her during the marriage. Although she
filed criminal charges against him, she admitted signing an affidavit for nonprosecution because she
was intimidated by Daniel. She also admitted that her application for protective order was denied. 
Misty stated that Daniel has been seriously involved with body building for one year and admitted
to her that he had been offered steroids. She denied dating Joshua San Miguel who testified that he
and Misty had a relationship one summer. Misty admitted that she and Ty smoked, but disagreed
that J.P.M. was allergic to smoke or had asthma.
            Dora Mobley testified that she is Daniel’s current wife. Throughout her marriage until
Daniel’s petition to modify, Misty spent two days and one night with J.P.M. Dora admitted that
J.P.M. calls her “mommy,” although she insisted that J.P.M. knows she is his stepmother. 
According to Dora, Misty’s possession schedule was not working because J.P.M. was becoming
confused and it interrupted his home and family schedule. 
            Teresa Mobley testified that she is Daniel’s mother and J.P.M.’s grandmother. According
to Teresa, J.P.M. began to live with her and Daniel when he was approximately one month old and
Misty moved in a few months later. After Misty and Daniel divorced, J.P.M. and Daniel lived with
her about eight months. Misty visited J.P.M. about twice a month, usually getting him on Friday
afternoon and returning him on Saturday or Sunday. For the past two years, J.P.M. has ridden the
school bus to her house after school. Teresa testified that J.P.M. stays with her until Daniel gets off
work. During these two years, Misty visited J.P.M. about once or twice a month. At one point,
Misty told Teresa that she was busy and planning to live with a friend. Teresa testified that it was
two months before Misty saw J.P.M. again. According to Teresa, she believed that if Daniel was
awarded visitation only with J.P.M., he would become sick from not seeing his father. 
            Ty testified that he is married to Misty and is employed by Lone Star Steel on a rotating
schedule. If he was working the swing shift and Misty was working nights, he could not say what
would happen to J.P.M. Ty testified that Daniel did not cooperate when Misty tried to work with
him about swapping time or talking to him about J.P.M.’s problems. Ty believed it was in J.P.M.’s
best interest for Misty to have custody because J.P.M. would be allowed a relationship with Daniel.
            Beverly Womack, a director of an outpatient program for mental health and substance abuse,
testified that she met with J.P.M. on December 1, 2003 at Misty’s request regarding J.P.M.’s
problems at school and his emotional instability. Womack met with J.P.M., individually or with
Misty, seven times through March 2004. Womack agreed that if, in December 2003, J.P.M. began
to see his mother more frequently in a different city with a new man in her life, that would be an
adjustment for him and could contribute to his acting out in school. Womack observed that J.P.M.
showed aggressiveness, anxiety, and features of attention deficit hyperactivity disorder and attention
deficit disorder. Womack was aware that, for the majority of J.P.M.’s life, he lived with Daniel.
Womack stated that J.P.M. was often reluctant to talk about his father’s household and never
spontaneously brought up his father. In her professional opinion, Womack believed that J.P.M.’s
reluctance to talk about his father indicated that he was told not to talk about his father. However,
Womack did not know that Daniel was unaware of her visits with J.P.M. until February 2004. 
            According to Womack, J.P.M. always referred to Misty as his mother and was very attached
to her. J.P.M. understood Misty’s difficult work schedule and felt very secure that she would not
leave him. Womack did not believe it would be appropriate or healthy for Daniel to insist that
J.P.M. refer to his stepmother as “mother.” She did not observe anything about J.P.M.’s relationship
or interaction with his mother that gave her any cause for concern about Misty’s having custody and
primary possession of him. Based on her observations, Womack believed that the most significant
person in J.P.M.’s life was his stepfather, Ty.
            Robert Mobley, Jr. is Daniel’s brother and J.P.M.’s uncle. He testified that J.P.M. was at
every Christmas Eve and Christmas Day family gathering for the last three years. Joshua San Miguel
testified that he lived in the same apartment complex as Misty in the summer of 2002. That summer,
he and Misty had a relationship and J.P.M. was present when he stayed overnight with Misty. From
his observations, J.P.M. was at Misty’s house for a day at the most. Joshua admitted that he and
Daniel worked security together.
            The amicus ad litem stated that J.P.M.’s life in Slocum was a big portion of his life. He
commended both parents, but stated it disturbed him that Misty had another child who had lived with
his father most of his life. The amicus ad litem opined that J.P.M. needed a place where he lived and
went to school five days a week while the other parent received standard visitation. In his opinion,
based on the testimony and visit with J.P.M., the child’s strongest bond was with Daniel’s family,
and he recommended that the trial court grant primary custody to Daniel. However, the amicus ad
litem stated that his recommendation was a “close call” and that the child would be safe if primary
custody was with either parent. 
            At the conclusion of the hearing, the trial court stated that both parents were “screwing
[J.P.M.] up” equally.


 The trial court stated that Daniel resented any relationship J.P.M. had with
Misty and tried to discourage it. However, the trial court observed that Daniel’s family environment
was positive, including his school and relationships with extended family. The trial court noted that
Daniel was not entirely negative, but stated that, if he were less so, the decision would be easy. The
trial court agreed that Misty should be commended for her advancements, but that the relief she
requested would require changes for J.P.M. After identifying the choice as a “tough call,” the trial
court appointed both parents joint managing conservators, awarding Daniel primary conservatorship.
The trial court granted Misty standard possession and ordered her to pay child support.
Analysis
            From this evidence and the record, the trial court reasonably could have concluded that
Misty’s new job and work hours, her husband’s rotating work schedule, and her moving some
distance from J.P.M.’s school since the rendition of the final decree of divorce constituted a material
and substantial change of circumstances. See In re P.M.B., 2 S.W.3d at 621-22. Thus, the trial
court did not abuse its discretion in finding that the material allegations in Daniel’s petition to
modify were true.
            Regarding J.P.M.’s best interest, the trial court could have considered evidence showing that
J.P.M. was very attached to Daniel and his extended family even though he appeared to be attached
to Misty and her new family. The trial court could have found that J.P.M. had been attending school
some distance from his mother’s new home for two years and that his daily schedule with Teresa was
longstanding and ongoing. Moreover, the amicus ad litem recommended that the trial court grant
primary custody to Daniel and emphasized the importance of Daniel’s family. Although the decision
was “tough,” the trial court interviewed J.P.M. and recognized that Daniel’s family, school, and
extended relationships were positive. The court also noted that granting the relief Misty sought
would require changes in J.P.M.’s life. Moreover, the trial court could have considered Misty’s
changed circumstances noted above as factors when determining J.P.M.’s best interest. All this
evidence supports a finding that modification was in the child’s best interest. Although there was
some evidence in the record that was favorable to Misty, we conclude that the trial court did not
abuse its discretion in finding that modification was in J.P.M.’s best interest. See id. Accordingly,
Misty’s sole issue is overruled.
 
Intervention
            In three issues, which are identical in substance, James argues the trial court erred in finding
that Daniel is the presumed father of J.P.M. and that the intervention is barred by limitations.
Further, James contends that the trial court erred in granting Daniel’s motion to dismiss the
intervention. More specifically, James argues that Daniel is the adjudicated, not the presumed, father
of J.P.M. and, therefore, the applicable statute of limitations is found in section 160.609 of the Texas
Family Code. James contends that his intervention is timely under section 160.609 and that the trial
court should have allowed genetic testing and an evidentiary hearing on his petition. Daniel argues
that he is the presumed father of J.P.M. As such, Daniel contends the trial court correctly concluded
that the statute of limitations in Texas Family Code section 160.607(a) applies and that James’s
intervention is barred. 
Applicable Law
            An “adjudicated father” is a man who has been adjudicated by a court to be the father of a
child. Tex. Fam. Code Ann. § 160.102(1) (Vernon 2002). A “presumed father” is a man who, by
operation of law under section 160.204, is recognized as the father of a child until that status is
rebutted or confirmed in a judicial proceeding. Tex. Fam. Code Ann. § 160.102(13) (Vernon 2002). 
A man is presumed to be the father of a child if he married the mother of the child after the birth of
the child in apparent compliance with the law, he voluntarily asserted his paternity of the child, and
he is voluntarily named as the child’s father on the child’s birth certificate. Tex. Fam. Code Ann.
§ 160.204(a)(4)(B)(Vernon Supp. 2005). A man is also presumed to be the father of a child if,
during the first two years of the child’s life, he continuously resided in the household in which the
child resided and he represented to others that the child was his own. Tex. Fam. Code Ann.
§160.204(a)(5) (Vernon Supp. 2005). Further, a presumption of paternity established under this
section may be rebutted only by an adjudication or the filing of a valid denial of paternity by a
presumed father in conjunction with the filing of another person of a valid acknowledgment of
paternity. Tex. Fam. Code Ann. § 160.204(b) (Vernon Supp. 2005). A proceeding brought by
another individual to adjudicate the parentage of a child having a presumed father shall be
commenced not later than the fourth anniversary of the date of the birth of the child. Tex. Fam.
Code Ann. § 160.607(a) (Vernon Supp. 2005). 
Analysis
            Daniel is named as J.P.M.’s father on the birth certificate, and nothing in the record suggests
that this was not voluntary. J.P.M. was born in March 1998, and Misty and Daniel married in
December of that same year. In her original petition, Misty stated that she and Daniel were the
parents of J.P.M. In his counter petition for divorce, Daniel asserted that he was J.P.M.’s parent. 
On May 12, 2000, the trial court found that J.P.M. was “born to the parties.” In all his motions and
petitions in the record, Daniel asserted that he was J.P.M.’s parent. At the modification hearing,
Daniel testified that J.P.M. was his son. From this evidence, we conclude that Daniel married the
mother of J.P.M. after the child’s birth in apparent compliance with the law, voluntarily asserted his
paternity of J.P.M., and was voluntarily named as J.P.M.’s father on the birth certificate. Thus,
Daniel is J.P.M.’s presumed father under section 160.204(a)(4)(B) of the Texas Family Code. See 
Tex. Fam. Code Ann. § 160.204(a)(4)(B).
            After J.P.M.’s premature birth, Misty lived with her mother, but at some point, moved in with
Daniel and Teresa. Although Misty stated that she and J.P.M. lived with her mother for three months
before moving, Teresa testified that J.P.M. moved in with them a month after he was released from
the hospital. Daniel testified that, after the divorce, he and J.P.M. lived with his mother while Misty
visited J.P.M. twice a month. In fact, Daniel testified at the modification hearing that the longest
period of time since the divorce that J.P.M. had been out of his or Teresa’s house was two nights.
From this evidence, we conclude that for the first two years of J.P.M.’s life, Daniel continuously
resided in the household in which J.P.M. resided and he represented to others that the child was his
own. Thus, Daniel is also J.P.M.’s presumed father under section 160.204(a)(5) of the Texas Family
Code. See Tex. Fam. Code Ann. § 160.204(a)(5). Therefore, the trial court did not err in finding
that Daniel was J.P.M.’s presumed father. 
            Although Daniel was adjudicated to be J.P.M.’s father in the divorce proceeding, he was
J.P.M.’s presumed father first. Moreover, at no time was Daniel’s presumption of paternity properly
rebutted. See Tex. Fam. Code Ann. § 160.204(b). As such, the statute of limitations for a presumed
father applies. See Tex. Fam. Code Ann. § 160.607(a). Because James brought his petition in
intervention more than four years after J.P.M.’s date of birth, his intervention is barred by the statute
of limitations. See Tex. Fam. Code Ann. § 160.607(a). Therefore, the trial court did not err in
granting Daniel’s motion to dismiss. Accordingly, James’s first, second, and third issues are
overruled.
 
Conclusion
            Based upon our review of the record, we conclude that the trial court did not abuse its
discretion in finding that the circumstances of the child, a conservator, or other party affected by the
order had materially and substantially changed since the date of the final decree of divorce and that
modification was in J.P.M.’s best interest. Further, we conclude that the trial court did not err in
finding that Daniel was J.P.M.’s presumed father and that James’s petition in intervention was barred
by limitations or in granting Daniel’s motion to dismiss. Therefore, the judgment of the trial court
is affirmed.
 
 
                                                                                                    DIANE DEVASTO 
                                                                                                                 Justice
 
 
Opinion delivered January 31, 2006.
Panel consisted of Worthen, C.J., Griffith, J., and DeVasto, J.







(PUBLISH)